People v Johnson (2025 NY Slip Op 06528)

People v Johnson

2025 NY Slip Op 06528

Decided on November 24, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 24, 2025

No. 86 

[*1]The People & c., Respondent,
v
Omar Johnson, Appellant.

Benjamin Rutkin-Becker, for appellant.
Emily A. Aldridge, for respondent.
Matthew Keller, for intervenor Hon. Letitia James, New York State Attorney General.

HALLIGAN, J.

The defendant in this appeal was convicted of attempted criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]). A firearm license would have given the defendant a defense to that charge. He contends that the U.S. Supreme Court's
decision in New York State Rifle & Pistol Assn., Inc. v Bruen (597 US 1 [2022]) renders the state's entire firearm licensing scheme facially unconstitutional and thus his conviction should be reversed.
We hold that although the defendant waived his right to appeal as part of a plea bargain, his facial constitutional challenge nonetheless survives. The defendant was directly affected by his criminal prosecution and conviction, and we conclude that he therefore has standing to challenge the licensing scheme even though he did not apply for a firearm license. But his claim fails on the merits. Before the trial court, the defendant argued only that Bruen's invalidation of the licensing scheme's "proper cause" requirement rendered the state's entire licensing scheme unconstitutional. That requirement is severable from the rest of the licensing scheme under New York law, and the defendant has not shown that there is no set of circumstances in which the licensing scheme would be valid. We therefore affirm.
[*2]I.
On July 30, 2022, police were called to defendant Omar Johnson's home in response to a 911 call reporting that he had hit his domestic partner. While investigating the incident, an officer discovered a loaded 9-millimeter pistol in the defendant's moped parked on the street in front of his home. After ascertaining that the defendant did not have a valid license for the pistol, the officer arrested the defendant, and he was indicted for various counts of criminal weapon possession and possession of ammunition. These events occurred shortly after the U.S. Supreme Court decided Bruen on June 23, 2022, and before the amendments to the state's firearm licensing scheme went into effect on September 1, 2022.[FN1]
The defendant moved to dismiss the indictment. Rather than attacking any specific provisions of the licensing scheme, he argued broadly that Bruen effectively "struck down New York's public carry licensing system" by invalidating the "proper cause" requirement. The defendant further contended that because the charges against him rested "solely on the basis that he did not obtain a license to carry a firearm," the indictment could not stand.
Supreme Court denied the motion. The court held that the defendant lacked standing to challenge New York's gun licensing laws because he had not applied for a license and could not show that it would have been futile for him to do so. The court also rejected his claim on the merits, concluding that Bruen had invalidated only the "proper cause" requirement and did not "render the entire licensing statute . . . unconstitutional."
The defendant subsequently pleaded guilty to attempted criminal possession of a weapon in the second degree and was sentenced to 5 years of probation. As part of his plea agreement, the defendant waived his right to appeal.
On appeal, the defendant renewed his argument that Bruen invalidated the state's entire firearm licensing scheme, notwithstanding his waiver. He argued that a Bruen claim cannot be waived because it "relates to a right of constitutional dimension going to the very
heart of the process" (quoting People v Benjamin, 216 AD3d 1457, 1457 [4th Dept 2023] [internal quotation marks omitted]). He also argued in the alternative that the waiver was not knowing and voluntary. On the merits, he continued to assert that Bruen's invalidation of the proper cause requirement rendered the entire licensing scheme unconstitutional, and also challenged for the first time several other provisions of the then-extant licensing scheme, such as the "good moral character" requirement, the requirement that an applicant be 21 years old, and the prohibition on possession by convicted felons.
The Appellate Division affirmed (225 AD3d 453 [1st Dept 2024]). The Court held that the defendant's appeal waiver was valid and foreclosed review of his Bruen claim. Alternatively, the court held that the defendant lacked standing to challenge the licensing scheme because he had not applied for a license, and that his conviction was not unconstitutional under Bruen (id. at 455).
A Judge of this Court granted leave to appeal (42 NY3d 939 [2024]).
II.
We must first determine whether the defendant's facial constitutional challenge survives the waiver of his right to appeal. In People v Seaberg, we held that appeal waivers generally are enforceable if they are knowing, intelligent, and voluntary (see 74 NY2d 1, 9 [1989]). We also noted that there are exceptions, though: Claims that "transcend the individual concerns of the defendant" and "implicate society's interest in the integrity of [the] criminal process" cannot be waived on appeal (id.).
Seaberg explained why most valid appeal waivers should be upheld. They are typically entered into as part of a plea bargain, which Seaberg describes as a "vital part of our criminal justice system" (id. at 7). Generally, there is "no public policy precluding defendants from waiving their rights to appeal as a condition of [a] plea and sentence bargain[]," and holding a defendant to the terms of such a deal serves the public's interest in the "final and prompt conclusion of litigation" (id. at 8, 10).
In furtherance of these interests, we have enforced waivers of various constitutional rights—a point highlighted by the concurrence (concurring op at 6). Those include the right to appeal Fourth Amendment suppression rulings (see People v Kemp, 94 NY2d 831, 833 [1999]), Fifth Amendment suppression rulings (People v Thomas, 34 NY3d 545, 553-554 [2019]), and double jeopardy claims (see People v Allen, 86 NY2d 599, 603 [1995]). But each of these types of claims presents a challenge to the legality of a specific proceeding concerning a particular defendant, akin to an as-applied constitutional challenge, rather than a broad claim that a statute was facially invalid.
On the other hand, we have held unenforceable waivers that "transcend the individual concerns of the defendant" and "embrace the reality of fairness in the process itself" (Seaberg, 74 NY2d at 9; see also People v Muniz, 91 NY2d 570, 574 [1998] [waivers implicating "a public policy consideration that transcends the individual concerns of a particular defendant to obtain appellate review" cannot be enforced]). One example we gave in Seaberg was a constitutional speedy trial claim (74 NY2d at 9). That claim cannot be waived on appeal because it implicates "a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused" (People v Blakley, 34 NY2d 311, 314 [1974] [internal citation omitted])[FN2]. Another example was a challenge to the illegality of a sentence (Seaberg, 74 NY2d at 9, citing People v Francabandera, 33 NY2d 429, 434 n 2 [1974]), which implicates a court's authority to sentence a defendant. Since Seaberg, we have also held that matters going to "the jurisdiction of the court" may not be waived (Thomas, 34 NY3d at 566).
We hold that a facial constitutional challenge such as the one presented here likewise falls into the narrow class of non-waivable appellate claims. Hornbook law underscores the very high bar for this type of challenge: a litigant must contend that "in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (Cohen v State, 94 NY2d 1, 8 [1999] [internal quotation marks omitted]). In the rare circumstances where a facial challenge is successful, "the law is invalid in toto—and therefore incapable of any valid application" (People v Stuart, 100 NY2d 412, 421 [2003] [internal quotation marks and citation omitted]), and thus the State will lack authority to prosecute or punish the defendant or anyone else for the conduct at issue. In
that key respect, a facial challenge goes squarely to the "fairness in the process itself" (Seaberg, 74 NY2d at 9), and transcends an individual defendant's concerns to implicate "a larger societal interest in its correct resolution" (People v Callahan, 80 NY2d 273, 280 [1992]). Accordingly, a waiver that precludes appellate review of a facial constitutional challenge to a criminal statute should not be enforced.
The Appellate Division's contrary view rested on the erroneous premise that the same standard governs whether an issue is waivable on appeal and whether preservation is required. Noting that this Court had already determined that Bruen claims must be preserved, the Appellate Division concluded that they also can be waived on appeal (225 AD3d at 454-55, citing People v David, 41 NY3d 90 [2023]). That approach improperly conflates the standards for preservation and waiver. The two inquiries present distinct considerations. Preservation implicates constitutional limitations on this Court's jurisdiction (see NY Const, art VI, § 3; People v Turriago, 90 NY2d 77, 80 [1997]). "[C]ritically," preservation also allows for "the development of a record that would allow for careful and deliberate adjudication on the merits of constitutional challenges presented to us" (People v Cabrera, 41 NY3d 35, 50 [2023]). Appeal waivers, by comparison, serve the important interests of prompt resolution, conservation of resources, and finality in litigation (see generally Seaberg, 74 NY2d 1). But they do not implicate this Court's jurisdiction. Nor does adjudicating an appeal despite a waiver impede the development of a record, which is a key distinction between the two doctrines. Because preservation and waiver serve different purposes, our prior determination that Bruen claims must be preserved does not resolve whether they can be waived on appeal.
Nor are we persuaded by the People's suggestion at argument, echoed by the Attorney General, that we might decline to enforce an appeal waiver if there is a "a glaring constitutional issue" (oral argument tr at 25) but otherwise enforce them. That approach would invert the analysis. If the enforceability of an appeal waiver turned on the strength of a constitutional challenge, a court would always have to peek at the merits before deciding whether to proceed, thereby defeating the point of the waiver. Moreover, any discomfort with enforcing an appeal waiver that prevents a defendant from challenging a patently unconstitutional statute proves the point, for it undoubtedly rests on a well-placed concern about prosecuting and punishing someone for violating a law that, by definition, is impermissible in each and every one of its applications.
The concurrence opines that our holding today will increase the burden on courts and litigants (concurring op at 13-14). But as with any claim, a facial constitutional challenge must be preserved in the trial court (see Cabrera, 41 NY3d at 42-43). Additionally, our precedent leaves no doubt that such a challenge faces an "extraordinary burden . . . of proving . . . that the challenged provision suffers wholesale constitutional impairment" to prevail (Owner Operator Ind. Drivers Assn., Inc. v New York State Dept. of Transportation, 40 NY3d 55, 61 [2023] [internal quotation marks and citation omitted]), and we assume that, consistent with their obligations to the court, attorneys will only bring such claims if they have a nonfrivolous basis for meeting this rigorous standard. Nor is it clear that enforcing appeal waivers would always lighten the workload; a brief review of recent Appellate Division cases reveals numerous instances in which the court upheld an appeal waiver but proceeded anyway to resolve a constitutional claim on the merits (see e.g. People v Liriano, 226 AD3d 520, 521 [1st Dept 2024]; People v Williams, 227 AD3d 480, 482 [1st Dept 2024]; People v Hines, 237 AD3d 643, 644 [1st Dept 2025]). And permitting appellate review of fully preserved facial constitutional challenges should promote judicial economy by ensuring prompt resolution of viable challenges to criminal prosecutions under a particular statute.
In sum, we conclude that the defendant's facial constitutional challenge to the state's firearm licensing scheme is not waivable and therefore survives his appeal waiver. We stress that the class of claims excepted from the general rule enforcing appeal waivers remains narrow. There will be few types of claims that transcend a defendant's individual interests and implicate a larger societal value to such an extent that they cannot be waived, and appeal waivers otherwise should be enforced. Because we hold that the claim here is not waivable, we need not address the defendant's alternative contention that his appeal waiver was not knowing and voluntary.
III.
Next, we turn to the defendant's standing to challenge the facial constitutionality of the state's firearm licensing scheme. Both the People and the Attorney General argue that the defendant lacks standing to challenge the constitutionality of the licensing scheme because he never applied for a firearm license. We disagree.
Although the briefs before us focus exclusively on federal standing doctrine, we note that federal and state standing doctrines are distinct (see Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 [1991]). "[T]he Federal constitutional requirement of a case or controversy . . . has no analogue in the State Constitution" (id.), and although someone challenging government action must demonstrate an "injury in fact" that falls within the "zone of interests or concerns sought to be promoted or protected by the statutory provision" (Stevens v New York State Div. of Criminal Justice Services, 40 NY3d 505, 515 [2023]), we do not appear to have explicitly embraced the federal requirement of traceability (see Lujan v Defs. of Wildlife, 504 US 555, 560 [1992]).
Here, the defendant has undoubtedly suffered a cognizable injury. Given his prosecution and conviction for unlicensed gun possession, he has an "actual legal stake in the matter being adjudicated" and has suffered a harm that is "sufficiently concrete and particularized to warrant judicial intervention" (Stevens, 40 NY3d at 515 [internal quotation marks omitted]). The defendant's injury is also within the "zone of interests sought to be promoted or protected by the statutory provision" (id. [internal quotation marks omitted]). Although the text of Penal Law § 265.03 (3) does not reference unlicensed possession of a firearm, a defendant may avoid prosecution under that provision by producing a valid firearm license (see Penal Law § 265.20 [a] [3]; David, 41 NY3d at 96). Thus, as this Court has recognized, "New York's criminal weapon possession laws prohibit only unlicensed possession of handguns" (People v Hughes, 22 NY3d 44, 50 [2013]). And here, the only basis for the defendant's conviction was that he possessed a gun without a license.
Guidance from the U.S. Supreme Court instructing that a defendant need not comply with what he alleges is an unconstitutional licensing scheme to challenge a criminal conviction reinforces our conclusion. For example, in Staub v City of Baxley (355 US 313 [1958]), a defendant was prosecuted for soliciting union membership without obtaining a permit. The Court held that "the failure to apply for a license under an ordinance which on its face violates the Constitution does not preclude review of a judgment of conviction under such an ordinance" (id. at 319). Similarly, in Shuttlesworth v City of Birmingham (394 US 147 [1969]), the defendant was prosecuted for participating in a civil rights march because he failed to comply with a city ordinance requiring a permit for all public demonstrations. Again, the Court held that a person criminally prosecuted for violating a licensing law need not apply for a license in order to "attack its constitutionality" (id. at 151).
The facts here are essentially indistinguishable in all but two respects. First, the defendant asserts a right under the Second Amendment rather than the First Amendment. But the Supreme Court made clear in Bruen that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees" (Bruen, 597 US at 70, quoting McDonald v City of Chicago, 561 US 742, 780 [2010]). Second, a valid firearm license is a defense to a criminal prosecution rather than an element of the offense. But the Legislature's decision to structure the Penal Law in this manner cannot shield the licensing regime from a facial constitutional challenge. The fact remains that the defendant was prosecuted only because he possessed a gun without a license, and he alleges that the state's gun licensing scheme is facially unconstitutional. The Attorney General attempts to distinguish Staub and Shuttlesworth by suggesting that the licensing schemes at issue in those cases were obviously void on their face. But that judgment entails consideration of the merits of a facial constitutional challenge. Because this would put the proverbial cart before the horse, it provides an inapt ground for parceling out standing.
The People and the Attorney General further argue that United States v Decastro (682 F3d 160 [2d Cir 2012]) requires a different result. Decastro rested on federal concepts of standing, which do not bind us, as noted. In any event, Decastro presented different circumstances. The defendant there was prosecuted for violating a federal law that prohibits transporting a firearm purchased in one state to another, and he argued that New York's gun licensing scheme effectively compelled him to leave the state to purchase a gun and then carry it back across state lines. The Second Circuit held that he lacked standing to challenge the constitutionality of the state's gun licensing scheme because he failed to apply for a license (id. at 164).
As the Second Circuit has since explained, Decastro had limited reach. The Circuit clarified that Decastro was really about "traceability" (see Antonyuk v James, 120 F4th 941, 979 n 21 [2d Cir 2024]). That is, there was no way to know whether the New York licensing scheme itself caused the defendant to buy a gun elsewhere and transport it across state lines, and thus the causal chain between his criminal conviction and the licensing scheme was too tenuous. Here, by contrast, the defendant's conviction is directly traceable to the state's licensing scheme. The Circuit also said that Decastro "governs only challenges to a licensing rule regarding eligibility" (id. at 979). Where a defendant's claim is rooted in "personal ineligibility" to obtain a firearm license, the Court explained, it makes sense to require the defendant to first attempt to obtain a license in order to challenge the eligibility rules (see id.). But when a defendant challenges the licensing application process itself, as in Antonyuk, the failure to apply for a license is not a barrier to standing (see id. at 979-80). The facts of this case resemble Antonyuk, not Decastro; the defendant challenges the facial constitutionality of the entire licensing scheme, not an eligibility rule.
We conclude that the defendant has standing to challenge the constitutionality of the state's firearm licensing scheme, notwithstanding his failure to apply for a license. On this point, we are aligned with sister courts in Massachusetts and California (see Commonwealth v Rodriguez, 496 Mass 627, 640, 267 NE3d 77, 90 [2025]; People v Bey, 108 Cal App 5th 144, 164, 328 Cal Rptr 3d 904, 919 [2025]; but see State v Ortiz, 317 A3d 737, 741-745 [RI 2024] [finding defendant did not have standing to challenge licensing statutes]).
IV.
Turning to the merits of the defendant's Second Amendment challenge, it is essential to spell out precisely the question before us. That turns, as always, on what arguments were made with "sufficient specificity" in the trial court (People v Robinson, 88 NY2d 1001, 1002 [1996]; see also People v Baumann & Sons Buses, Inc., 6 NY3d 404, 408 [2006] [applying same rule to a constitutional challenge]). We are able to discern from the defendant's motion papers only one claim made with the requisite specificity: that Bruen's invalidation of the "proper cause" requirement rendered New York's entire firearm licensing scheme facially unconstitutional.
Bruen presented a challenge to one discrete aspect of New York's firearm licensing scheme: the "proper cause" requirement. The Court's analysis and holding was confined to that provision and did not address any other aspect of New York's licensing scheme (see Bruen, 597 US at 16, 31, 39, 60, 67, 70-71). To the contrary, Bruen instructed that states are not prohibited from imposing licensing requirements on persons who wish to carry a gun for self-defense. The Court observed that Second Amendment rights are subject to "well-defined restrictions" and expressed approval for the gun licensing regimes of 43 states with "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course" (Bruen, 597 US at 38 & n 9). Several concurrences made similar points (see id. at 79-81 [Kavanaugh, J., concurring] [noting that "the Second Amendment allows a variety of gun regulations" including "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places" (internal quotation marks omitted)]; id. at 72 [Alito, J., concurring] [stressing that the Court's holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun"]).
Whether the "proper cause" requirement infected the rest of the licensing scheme so as to render it unconstitutional in its entirety raises a question of severability. To answer it, we look to legislative intent: "whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether" (CWM Chem. Servs., L.L.C. v Roth, 6 NY3d 410, 423 [2006], quoting People ex rel. Alpha Portland Cement Co. v Knapp, 230 NY 48, 60 [1920]).
We find the "proper cause" requirement severable. The text and structure of the licensing scheme evince a clear legislative intent to regulate the lawful purchase, possession, and use of firearms. The licensing scheme is detailed and multi-faceted; the "proper cause" provision was just one aspect of a much broader scheme that includes a variety of distinct requirements. For example, a separate provision sets forth various eligibility criteria to obtain a license, including that the applicant be over 21 years of age, of good [*3]moral character, not a convicted felon, and not an unlawful user of a controlled substance (see Penal Law § 400.00 [1]). Another provision sets forth the types of licenses that an applicant may obtain (see Penal Law § 400.00 [2]). Other provisions set forth the procedures for applying and reviewing gun license applications (see Penal Law § 400.00 [2]-[5]). We find it implausible that the Legislature would have intended for all of these other provisions to be invalidated simply because the "proper cause" requirement was deemed unenforceable.
The structure of the licensing scheme points to another reason why the defendant's facial challenge fails. The party making a facial challenge must establish that a law is unconstitutional in every possible application (see supra at 6). It is the "most difficult challenge to mount successfully, because it requires a defendant to establish that no set of circumstances exists under which the [challenged statute] would be valid" (United States v Rahimi, 602 US 680, 693 [2024] [internal quotation marks omitted]).
The defendant has failed to show that there is no set of circumstances in which the licensing scheme would be constitutionally valid. To take one example, the statute prohibits gun possession by convicted felons (see Penal Law § 400.00 [1]). The defendant makes no argument before us that this provision is unconstitutional. Without opining on that question, we note that the Supreme Court has made clear that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others" (Rahimi, 602 US at 693; see also United States v Duarte, 137 F4th 743, 761 [9th Cir 2025] [upholding the federal statute prohibiting firearm possession by convicted felons against a Second Amendment challenge]; Vincent v Bondi, 127 F4th 1263, 1265 [10th Cir 2025] [same]; United States v Hunt, 123 F4th 697, 708 [4th Cir. 2024], cert denied 145 S Ct 2756 [2025] [same]).
With these principles in mind, we are confident that the Legislature would have intended for the rest of the licensing scheme to remain in effect following Bruen's invalidation of the "proper cause" requirement. Indeed, when the Legislature enacted amendments to the licensing scheme following Bruen, it maintained many of the same requirements, providing further evidence that the Legislature intended for those provisions to remain in effect. We therefore conclude that the "proper cause" requirement is severable, and its invalidation did not render the entire licensing scheme unconstitutional.[FN3]
Finally, we reject the defendant's contention that the People were required to provide evidence that the entire licensing scheme is consistent with the Nation's historical tradition of firearm regulation. Although Bruen's "historical tradition" framework would govern challenges to discrete provisions of any gun regulations (see e.g. Antonyuk, 120 F4th at 987), the defendant's broad claim before us—that Bruen's invalidation of the "proper cause" requirement effectively rendered the entire licensing scheme unconstitutional—does not implicate this inquiry, and the constitutionality of the other provisions of the licensing scheme is not before us [FN4]. We hold only that Bruen did not render the state's entire gun licensing scheme unconstitutional because the "proper cause" provision is severable.
Accordingly, the order of the Appellate Division should be affirmed.

CANNATARO, J. (concurring):

Although I agree that the Appellate Division order should be affirmed, I would do so on the ground that defendant's appeal waiver bars appellate review of his claim that New York's criminal weapons possession statute facially violates the Second Amendment of the U.S. Constitution.
Until today, this Court had identified only five narrow types of claims that survive an appeal waiver, each implicating either the integrity of the process leading to the waiver or the courts' power to accept and enforce it. Although facial constitutional challenges have been commonplace in the law for well over a century (see e.g., Gladson v Minnesota, 166 US 427, 429 [1897]), we have never previously suggested that public policy precludes defendants from agreeing to waive appellate review of such claims in exchange for a favorable plea deal. To the contrary, we have repeatedly concluded that constitutional arguments were foreclosed by appeal waivers. No public policy or societal interest justifies the majority's departure from well-established precedent and interference with legally valid and socially beneficial plea bargains.
* * *
In 2022, the mother of defendant's domestic partner called 911 and reported that defendant had violently attacked her daughter. While investigating the matter, an officer witnessed defendant approach the victim and her mother on the street and threaten, "Both of you are dead. I will kill you." Adding credence to that threat, police discovered a nine millimeter pistol loaded with seven rounds of ammunition in the moped defendant used for work as a food-delivery driver. The gun was unregistered, and defendant did not have a
gun license. Indeed, defendant's prior felony conviction [FN1] likely disqualified him from obtaining a license even under the more permissive licensing regime this State enacted following the United States Supreme Court's decision in New York State Rifle & Pistol Assn., Inc. v Bruen (597 US 1 [2022]) (see Penal Law § 400.00 [1] [c]).
A grand jury indicted defendant for criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), a class C violent felony carrying a mandatory minimum prison sentence of 3½ years and a [*4]potential maximum sentence of 15 years (see id. § 70.02 [1] [b], [3] [b]). In advance of trial, defendant moved to dismiss the charges as unconstitutional under Bruen and the Second Amendment. When that motion was denied, defendant entered into a plea deal with the prosecution in which he agreed to forgo trial and plead guilty to a lesser charge, namely, attempted criminal possession of a weapon in the second degree (see Penal Law §§ 110.00, 265.03 [3]), in exchange for a sentence of probation. As a condition of the deal, the prosecution also required that defendant waive his right to appeal the conviction. Defendant accepted this condition and affirmatively waived his right to appeal, both orally and in writing, following consultation with his attorney and a lengthy colloquy with the court. The court accepted the deal, determining that defendant's plea and appeal waiver were knowingly, intelligently, and voluntarily made, and imposed the bargained-for sentence of probation.
Defendant nonetheless took an appeal from his judgment of conviction in which he attempted to revive his Bruen-based challenge. The Appellate Division unanimously affirmed, holding as a threshold matter that defendant's voluntary waiver of his right to appeal foreclosed appellate consideration his Second Amendment claim (225 AD3d 453, 453 [1st Dept 2024]). I agree.
This Court has long recognized that plea bargaining is "a vital part of our criminal justice system," without which "New York's law enforcement system would collapse" (People v Seaberg, 74 NY2d 1, 7 [1989]; accord People v Thomas, 34 NY3d 545, 557 [2019]; see generally People v Selikoff, 35 NY2d 227, 232-235 [1974], cert denied 419 US 1122 [1975]). "Aside from conserving judicial resources and providing finality in criminal proceedings, the plea bargaining process affords the accused the opportunity to obtain a conviction on reduced charges and more lenient punishment in a truncated process that hopefully starts the offender on the road to possible rehabilitation" (Thomas, 34 NY3d at 557 [internal quotation marks, brackets, and citation omitted]; Seaberg, 74 NY2d at 7; Selikoff, 35 NY2d at 232-235; see also Santobello v New York, 404 US 257, 261 [1971]). Although the process "necessarily includes the surrender of many guaranteed rights . . . when there is no constitutional or statutory mandate and no public policy prohibiting it, an accused may waive any right which he or she enjoys" (Seaberg, 74 NY2d at 7).
The plea bargain in this case, like so many others, was conditioned on defendant's agreement to waive not only the right to a trial but the right to appeal from his judgment of conviction. This Court endorsed that practice in Seaberg, broadly declaring that "no public policy preclud[es] defendants from waiving their rights to appeal as a condition of . . . plea and sentence bargains" (id. at 10). To the contrary, "the public interest concerns underlying plea bargains generally are served by enforcing waivers of the right to appeal" (id.). "While important," the right to appeal "is no more fundamental than the right to a jury trial" and all the concomitant due process protections afforded with it that are necessarily waived as part of any plea deal (see id. at 7). Moreover, "the final and prompt conclusion of litigation is an important goal of public policy," and "the negotiating process serves little purpose if the terms of a carefully orchestrated bargain can subsequently be challenged" on appeal (id. at 8, 10 [internal quotation marks omitted]).
In view of these public policy considerations, this Court has stated that only a "narrow class of appellate claims" may be raised in the face of an appeal waiver (see People v Muniz, 91 NY2d 570, 574 [1998]). Although we have described this class in varying ways, the only claims we have historically recognized as excepted from the Seaberg rule are those implicating (1) the voluntariness of the plea, (2) the defendant's competency to stand trial, (3) the constitutional right to a speedy trial, (4) the court's jurisdiction over the case, or (5) the legality of the sentence imposed (see People v Lopez, 6 NY3d 248, 255 [2006]; People v Campbell, 97 NY2d 532, 535 [2002]; Seaberg, 74 NY2d at 9). As we explained in Seaberg itself, "[t]hese rights are recognized as a matter of fairness to the accused but they also embrace the reality of fairness in the process itself and, therefore, a defendant may not waive them" (Seaberg, 74 NY2d at 9 [emphasis added]).
More specifically, voluntariness challenges cannot be waived because they call into question whether a defendant actually understood and agreed to the plea and appeal waiver following a negotiation process [*5]free from coercion or deception (see Thomas, 34 NY3d at 559). Competency challenges are essentially a subset of voluntariness challenges: they cannot be waived because of the "inherent contradiction in arguing that a defendant may be incompetent, and yet knowingly or intelligently waive his right[s]" (see People v Armlin, 37 NY2d 167, 172 [1975]). Similarly, constitutional speedy trial claims are unwaivable because of the "inherently coercive" impact that severe trial delays can have on pleas and appeal waivers (People v Blakley, 34 NY2d 311, 313 [1974]). As we explained in Seaberg, such delays "may result in the loss of evidence or an accused's inability to respond to criminal charges, thereby compelling innocent persons to plead guilty out of necessity" (74 NY2d at 9; see also Blakley, 34 NY2d at 314-315). Finally, challenges to the court's jurisdiction or the legality of a sentence cannot be waived because they implicate judicial authority to accept and enforce the terms of even a voluntary plea deal and appeal waiver (see People v McLaughlin, 80 NY2d 466, 471 [1992]; Campbell, 97 NY2d at 535).
In the 36 years since Seaberg, this Court has not expanded the list of unwaivable appellate claims beyond these discrete categories implicating the integrity of the process leading to the plea bargain or the court's authority to enforce that bargain. Over this period, we have in fact repeatedly held that claims involving constitutional rights can be waived (see e.g., Thomas, 34 NY3d at 552-553, 557-558, 564-565 [Fifth Amendment claim regarding the privilege against self-incrimination]; People v Kemp, 94 NY2d 831, 832-833 [1999] [Fourth Amendment suppression claim]; People v Allen, 86 NY2d 599, 602-603 [1995] [double jeopardy claim]). The Appellate Division has likewise held that an appeal waiver bars review of substantial constitutional issues, including a defendant's right to retain counsel of his choosing (People v Doyle, 82 AD3d 564 [1st Dept 2011], lv denied 17 NY3d 805 [2011]) and constitutional challenges to New York's recidivist sentencing laws (People v Rodriguez, 82 AD3d 794 [2d Dept 2011], lv denied 17 NY3d 809 [2011]; People v Rodriguez-Ortiz, 23 AD3d 204 [1st Dept 2005], lv denied 6 NY3d 817 [2006]).
Today's decision represents a profound and troubling departure from precedent. The majority now holds that appellate review of a facial constitutional challenge can never be waived as part of a plea bargain. Even if the waiver was knowingly, intelligently, and voluntarily made, the trial court had jurisdiction to accept it, the negotiated sentence is legal, and the challenge itself is patently lacking in merit, an appellate court must entertain and resolve it. Apparently, this holding applies not just to Second Amendment challenges, but to any argument that a criminal statute is unconstitutional on its face, irrespective of the particular constitutional right or doctrine raised, or whether it implicates the integrity of the process that led to the waiver.
The majority fails to identify any public policy or societal interest that rationally justifies opening the doors of appellate courts to such a practically innumerable assortment of waived facial constitutional challenges. My colleagues assert only that there is a "very high bar" to succeed on a facial challenge, and that in the rare event a defendant does succeed, the resulting decision will preclude similar prosecutions (see majority op at 6). Because of this potential preclusive effect, the majority opines, a facial constitutional challenge "goes squarely to the fairness in the process itself and transcends an individual defendant's concerns to implicate a larger societal interest in its correct resolution" (see id. at 7 [internal quotation marks and citation omitted]).
As legal support, the majority relies heavily on People v Muniz, in which we described the "previously identified" Seaberg exceptions as encompassing claims that implicate, inter alia, "a public policy consideration that transcends the individual concerns of a particular defendant to obtain appellate review" (Muniz, 91 NY2d at 574; see majority op at 5). Even under a plain reading of that language,[FN2] however, the relevant question is not whether the consequences of hearing a claim will "transcend" the underlying case—a possibility that exists with all appeals by virtue of our common-law system and stare decisis. Rather, the [*6]question is whether there is a public policy consideration (as opposed to a mere personal interest) that overrides the compelling societal interests favoring the enforcement of plea bargains.
Seaberg was very specific and narrow in describing the type of public policy considerations that are important enough to meet that standard. As the majority acknowledges, this Court agreed with the defendant in Seaberg that constitutional speedy trial claims are illustrative of "matters in which the interests of society transcend the individual concerns of the defendant" (74 NY2d at 9). The majority nonetheless relegates to a dismissive footnote our substantive reasoning that "[s]ociety has a recognized interest in speedy trials because trial delay may result in the loss of evidence or an accused's inability to respond to criminal charges, thereby compelling innocent persons to plead guilty out of necessity. Because of this societal interest, a defendant may not waive such claims" (74 NY2d at 9 [emphasis added]). As discussed above, our concern was specifically that "the nature of the speedy trial guarantee renders [an appeal waiver] condition inherently coercive in a plea bargaining situation" (Blakley, 34 NY2d at 313). The majority also ignores our statement in Seaberg that even where a claim may be said to "implicate society's interest in the integrity of the criminal process," enforcement of an appeal waiver is warranted if "that interest is protected by the procedural and substantive requirements imposed on the Trial Judge before the defendant may be sentenced" (Seaberg, 74 NY2d at 9).
The majority does not identify any public policy consideration or societal interest at play here that is remotely analogous to the public interest against coercive pleas discussed in Seaberg and Blakeley. The alleged unconstitutionality of New York's criminal weapons possession statute is not the kind of defect that raises a risk of innocent persons pleading guilty out of necessity. Even if it does, the extensive procedural and substantive requirements imposed on trial judges before appeal waivers are accepted adequately protect defendants from being coerced into waiving appellate review of their Bruen-based Second Amendment claims (see generally Thomas, 34 NY3d at 558-563). Here, the record shows that defendant's appeal waiver was the quid pro quo for a "highly beneficial bargain"—a plea to a lesser charge and sentence to only five years of probation, compared to the mandatory prison sentence of between 3½ and 15 years that he would face had he been convicted after trial [FN3]—and the trial court followed proper procedure to ensure that the bargain was fair and voluntary (see id. at 564; see also Allen, 86 NY2d at 603).
The majority gestures at society's interests in a fair criminal process and the "correct resolution" of facial constitutional challenges, but never concretely explains how enforcement of defendant's appeal waiver threatens those interests (see majority op at 7 [internal quotation marks omitted]). The enforcement of defendant's waiver does not prevent defendants facing similar prosecutions from preserving and maintaining their own facial constitutional challenges, whether by deciding not to plead guilty or simply by carving such claims out of their appeal waivers. Nor does the enforcement of appeal waivers lead to the incorrect resolution of facial challenges. All it does is reserve the resolution of such claims for future cases, in which the right to appeal was not bargained away as "the quid pro quo to the reduced plea bargain" (see Thomas, 34 NY3d at 564). To the extent the majority suggests there is a societal interest in facial challenges being resolved at the earliest possible opportunity, that rationale runs headlong into our statement in Seaberg that "there is no affirmative public policy to be served in fostering appeals or prohibiting their waiver" (74 NY2d at 8). Surely, if a criminal statute is unconstitutional in all its applications, there is ample opportunity for courts to take proper action without upsetting the compelling societal interests that underlie plea bargaining or permitting a defendant to "eviscerate the favorable plea bargain he knowingly and voluntarily accepted" (Thomas, 34 NY3d at 565; see also id. at 557-558; Seaberg, 74 NY2d at 7-8). After all, it only takes one preserved and maintained facial challenge to vindicate the public interest in striking down a facially unconstitutional statute.
Further, while I agree with the majority that the Appellate Division erred in conflating our standards regarding waiver with those concerning preservation (majority op at 7), it is equally erroneous to suggest that precedent addressing our preservation requirement is irrelevant to this discussion. As a constitutional limitation on this Court's appellate jurisdiction, our preservation requirement embodies the highest of public policies regarding the scope of appellate review, and there are obvious conceptual links between our preservation and waiver standards. Just two years ago, we held that Bruen-based challenges do not qualify for the "mode of proceedings exception" to our preservation requirement because they do not implicate "the essentially validity of the proceedings conducted below" (People v Cabrera, 41 NY3d 35, 43 [2023]). The wall the majority attempts to erect today between our waiver and preservation standards does not hide the cognitive dissonance between that conclusion in Cabrera and the majority's suggestion today that the same types of challenges do implicate the integrity of the criminal process for waiver purposes. A more logically consistent conclusion would be that, if a defendant can effectively waive a facial constitutional challenge by never asserting such claim in the first place, it does not offend any compelling societal interest for a defendant to waive the right to appellate review after their claim has been fully litigated and rejected at the trial level (cf. Seaberg, 74 NY2d at 7 [one reason the right to appeal is waivable is because, "as a practical matter, defendants frequently lose their right to appeal, by forfeit, when they fail to exercise it or abscond"]).
The majority also fails to articulate a public policy consideration that meaningfully distinguishes facial constitutional challenges from other types of claims. For instance, claims that a Penal Law statute has been incorrectly interpreted have similarly broad stare decisis effect. If successful, "the State will lack authority to prosecute or punish the defendant or anyone else for the conduct at issue" (majority op at 6). If anything, the public policy considerations that favor the enforcement of appeal waivers are stronger with respect to facial constitutional challenges than other types of claims. Facial challenges have been characterized as "disfavored" because they "often rest on speculation," "raise the risk of premature interpretation of statutes on the basis of factually barebones records," and "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" (Washington State Grange v Washington State Republican Party, 552 US 442, 450 [2008] [internal quotation marks omitted]). Despite this, facial constitutional challenges are common and can be asserted under many different constitutional provisions—they are not a narrow category like the other exceptions we have recognized (see Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Calif L Rev 915, 917-918 [Aug. 2011]). Nor are the stare decisis consequences of a successful facial challenge always obvious and straightforward.
Take Bruen, for instance. Bruen significantly altered Second Amendment jurisprudence, not only by recognizing a fundamental constitutional right to carry a firearm in public for the first time in this Nation's history, but by creating a "historical tradition" test for Second Amendment claims (see Bruen, 597 US at 17). In the wake of Bruen, Second Amendment challenges have proliferated across the country. While New York data is not readily available, "[f]ederal trial courts addressed 420 claims in the post-Bruen year, roughly equivalent to the number of Second Amendment claims addressed by district courts from 2008 through 2014" (Eric Ruben et al., One Year Post-Bruen, an Emprical Assessment, 10 Va L Rev Online 20, 30 [Feb. 2024]). That pace only appears to be increasing (see Chip Brownlee, More Than a Thousand Felons Have Challenged Their Gun Bans Since the Supreme Court's Bruen Decision, The Trace [Sept. 12, 2024], available at https://www.thetrace.org/2024/09/ felon-gun-ban-law-bruen-supreme-court [last accessed Nov. 15, 2025] [between 2022 and 2024, federal judges "issued on average two Bruen-related rulings each working day"]). These challenges have been far from uniform: they target sensitive-place restrictions, age requirements, background checks, insurance mandates, safe storage requirements, ownership of firearms by convicted felons, assault-weapons bans, and sentencing enhancements, among other areas (see Ruben, 10 Va L Rev Online at 35-40).
Responding to and resolving these challenges imposes substantial burdens on prosecutors, courts, and the Attorney General, who is tasked with defending the constitutionality of state statutes. Although there is, of course, a societal interest in constitutional questions being correctly resolved, that is best accomplished through an orderly and deliberate process. Plea bargaining and appeal waivers facilitate the orderly presentation of consequential constitutional arguments to appellate courts by ensuring that those courts can focus their attention on the appeals that litigants themselves have deemed most worthy of pressing forward.
In the end, what we are left with following today's decision is the suggestion that an appeal waiver is unenforceable whenever this Court in its subjective policy judgment feels that appellate review of a claim would be beneficial. This unpredictability regarding the enforcement of appeal waivers not only incentivizes unnecessary litigation, it disincentivizes the People from offering as favorable terms in plea negotiations. Indeed, although one of the problems with unintended consequences is that they defy prediction, it is not difficult to imagine that, going forward, prosecutors will offer less favorable plea deals to defendants who assert facial constitutional challenges.
None of this is beneficial to criminal defendants, the appellate review process, or society at large. For over a century, facial constitutional challenges have been correctly and efficiently resolved without the exception the majority recognizes today. There is simply no reason or need for this Court to consider whether defendant had a constitutional right to carry a loaded, unlicensed firearm in his moped, after he knowingly and voluntarily waived the right to appeal that argument in return for a lenient sentence. I would therefore affirm the Appellate Division on the ground that defendant's appeal waiver forecloses appellate review of his claim.
Order affirmed. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera and Troutman concur. Judge Cannataro concurs in result in an opinion, in which Judges Garcia and Singas concur.
Decided November 24, 2025

Footnotes

Footnote 1: Following the Supreme Court's decision in Bruen, the Legislature enacted the Concealed Carry Improvement Act ("CCIA"). Signed into law on July 1, 2022, the CCIA amended various firearms-related provisions of the Penal Law, General Business Law, Executive Law, and Civil Practice Law. Those amendments are not at issue in this appeal.

Footnote 2: As the concurrence notes, we expressed concern in Seaberg and Blakley that trial delay may compel an innocent person to plead guilty (Seaberg, 74 NY2d at 9; Blakley, 34 NY2d at 314-315). But our rationale for declining to enforce an appeal waiver for a speedy trial claim was not confined to protecting an individual defendant against this coercive result. We noted that the speedy trial guarantee also serves distinct societal interests, citing Barker v Wingo (407 US 514 [1972]) (see Blakley, 34 NY2d at 314). As Barker explains, these interests include mitigating court backlogs, as well as reducing opportunities for defendants on bail to commit other crimes and incentives for confined defendants to escape (407 US at 519-520). Barker also notes that delay "may work to the accused's advantage" given that "witnesses may become unavailable or their memories may fade" (id. at 521), and thus holding an appeal waiver unenforceable in this context may not actually serve a defendant's interests.

Footnote 3: Other state courts have reached a similar conclusion (see In re D.L., 93 Cal App 5th 144, 163, 310 Cal Rptr 3d 562, 579 [2023] [holding that the "good cause" provision of the California's gun licensing scheme, though invalid after Bruen, was severable and that the entire licensing scheme therefore was not facially unconstitutional); Bey, 108 Cal App 5th at 166, 328 Cal Rptr 3d at 920 [same]; Rodriguez, 496 Mass at 642, 267 NE3d at 92 [rejecting a facial challenge to Massachusetts' gun licensing scheme because the prohibition on firearm possession by felons or violent criminals was "consistent with the Second Amendment" and therefore the licensing scheme was constitutional in "at least 'some of its applications' "]).

Footnote 4: Although the case was decided on different grounds, we note that the Illinois Supreme Court also recently declined to apply the "historical tradition" framework when reviewing a facial challenge to the state's licensing scheme, reasoning that "Bruen's express endorsement of shall issue licensure obviates the need for this court to apply the historical-tradition component of the Bruen analysis to defendant's facial challenge" (People v Thompson, 2025 IL 129965, ¶ 53, — NE3d — [2025]).

Footnote 1: Defendant was previously convicted of armed robbery in Georgia and was sentenced to ten years in prison and ten years of probation for that offense.

Footnote 2: It is worth noting that the quoted phrase derives from an argument made by the defendant in Seaberg; it is not how this Court traditionally described the classes of unwaivable claims (see Seaberg, 74 NY2d at 9).

Footnote 3: It is unclear from the record whether defendant's prior felony conviction increased his sentencing exposure. If it did, one can imagine that a negotiated sentence of probation would have been even more attractive.